FILED
CLERK, U.S. DISTRICT COURT

08/19/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ LM _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| **MAURICE FRANKLIN,** ) | |
| ) | **Jury Requested** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No.**  5:21-cv-01413 JWH (SPx) |
| ) | |
| **MAXIMUS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**IFP**
**No CV-71**
**No CV-30**
**No Sum**

**COMPLAINT**

NOW COMES Plaintiff Maurice Franklin ("Plaintiff"), pro se litigant, for his Complaint against Defendant, Maximus Inc. ("Defendant" or "Company"), and states:

1. This is an action under Title VII of the Civil Rights Act of 1964 and as amended by, inter alia, the Civil Rights Act of 1990, the Equal Pay Act, and the Civil Rights Act of 1866, for the Defendant having subjected Plaintiff to race and sex discrimination, disparate treatment, a hostile work environment, harassment and retaliation for protected activity.

**Parties, Jurisdiction and Venue**

2. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Act"), 42 U.S.C.A. §§ 2000(e) et. seq.

3. Plaintiff is a black male who resides in Cook County, Illinois.

4. Defendant is a for profit corporation headquartered in Reston, Virginia and doing business in Cook County, Illinois.

5. Defendant supplies services for its clients, who are generally government entities.

6. Defendant is an employer as that term is defined under the Title VII of the Civil Rights Act of 1964, as amended.

7. At all relevant times, Plaintiff has worked for Defendant while located in Cook County, Illinois or in Riverside County, California.

**Statement of Facts and General Allegations**

1

8. Plaintiff began working for the Defendant in 2001 and has worked continuously for the Defendant since 2005.

9. Plaintiff currently holds the position of "Vice President, Executive Oversight." He has held this position since January 1, 2014.

10. This position is part of Defendant's "Human Services" division.

11. In his position, Plaintiff manages client relationships, provides financial planning and forecasts, performs project performance adherence, supervises team members, and currently supports the leadership teams and "New Hire" programs in 16 states.

12. From 2014-2020, Laura Rosenak ("Rosenak"), a white female, was Plaintiff's immediate supervisor in Defendant's "Human Services" division.

13. In 2017, Rosenak asked Plaintiff to hire two of Rosenak's family members, both white females.

14. Upon information and belief, none of Plaintiff's similarly situated, non-black co-workers were asked to hire and/or supervise Rosenak's family members.

15. In 2017, Plaintiff contacted Defendant's "Human Capital"[1] department for guidance regarding what Plaintiff believed was the inappropriate hiring of Rosenak's family members.

16. At this time, Defendant's Human Capital division was led by Kim Colbert ("Colbert"), a white female.

17. After Plaintiff reached out to the Human Capital Division, Plaintiff was subjected to harassing treatment from Rosenak and subject to discriminatory treatment from Rosenak and the Defendant.

18. On one occasion, Rosenak attempted to subject Defendant to an inappropriate and unwanted touching.

19. On multiple occasions, Rosenak made inappropriate comments directed at Plaintiff.

20. For instance, while on a business trip, and in the presence of coworkers, Rosenak informed Plaintiff that he could not work for her if he grew his hair into braids.

21. On multiple occasions, Rosenak made threatening comments regarding Plaintiff's attempts to apply for other positions within the Company.

22. On multiple occasions, Rosenak and Defendant arbitrarily reassigned Plaintiff's

---

[1] Defendant's "Human Capital" division is equivalent to the traditional "Human Resources" department

subordinates and team members for no legitimate business purpose.

23. For instance, on May 20, 2020, Rosenak arbitrarily reassigned Michael Lant ("Lant"), despite the lack of legitimate business reasoning and to the operational detriment of Plaintiff and his team members.

24. On October 9, 2020, Defendant removed two of Plaintiff's subordinates from a project to the detriment of Plaintiff and without consulting with, or communicating the decision to, Plaintiff.

25. On multiple other occasions, Defendant's agents, including Rosenak, HR Manager Kim Colback ("Colback"), Vice President Lisa Simmons ("Simmons"), all women, attempted to poach or transfer Plaintiff's team members to different supervisors and divisions for no reasonable or discernable business purpose.

26. On multiple occasions, Rosenak arbitrarily harassed Plaintiff's subordinates and team members.

27. For instance, Rosenak and her daughter, Hatley Secondo ("Secondo"), a white female, created an email group containing Plaintiff's subordinate managers without Plaintiff's inclusion or knowledge and, due to the sensitive information shared in this email group, upon finding out about the group, Plaintiff asked that his managers be removed from the group due to his subordinates' discomfort.

28. When Plaintiff asked that his managers be removed from the group due to the tension created by shared information, Rosenak berated Plaintiff without cause.

29. On multiple occasions, when Plaintiff questioned Defendant's staffing decisions as they related to Plaintiff's team members and subordinates, Defendants' agents, Rosenak, Peter Baylinson (Vice President of Finance), and Curtis Briggs (Project Director), all white employees, verbally attacked Plaintiff, resulting in undue emotional distress.

30. On multiple occasions, Defendant, usually through Rosenak, attempted to sabotage Plaintiff's work product.

31. Rosenak regularly assigned Plaintiff last-minute assignments and presentations, something that she did not do to Plaintiff's peers who were not black males.

32. Defendant's agents and Plaintiff's superiors regularly publicly praised and rewarded similarly situated white employees for accomplishments, while never publicly praising or rewarding Plaintiff for similar or better accomplishments.

33. For example, after Plaintiff successfully negotiated beneficial contract terms and conditions for the struggling "LifeLine" program and during a meeting with the CEO, CFO, and other Company executives, Rosenak praised Rick DiLolio, a white male and Plaintiff's subordinate who had little involvement with the project, for his effort and mentioned potentially promoting him for the effort.

34. Shortly thereafter, the Company promoted DiLolio.

35. Plaintiff did not receive the same wages, compensation, and benefits as his similarly situated coworkers who weren't black males.

36. For instance, in February 2021, Plaintiff learned that he did not receive Company stock grants unlike other similarly situated employees and subordinates who were not black males.

37. When Plaintiff asked Rosenak and Human Capital officials about the stock grants, he was ignored and not provided an explanation as to why he did not receive them.

38. In December 2019, Defendant cut Plaintiff's annual bonus amount by approximately $20,000.00, despite the growth of Plaintiff's customer accounts exceeding those of his similarly situated white peers.

39. Plaintiff later learned that in 2019, at the same time Defendant cut Plaintiff's bonus for no legitimate business reason, it raised or maintained the bonuses of many similarly situated employees who were not black males.

40. Plaintiff's annual bonuses remain well-below bonuses he received prior to 2019.

41. Upon information and belief, Plaintiff received a lesser salary than similarly situated employees who are not black males.

42. Upon information and belief, Defendant compensated many of Plaintiff's white subordinates at a higher salary than it compensated Plaintiff and Defendant attempted to conceal this information from Plaintiff.

43. In an attempt to hide colleague salary information, Defendant excluded Plaintiff from calls where employee financials were discussed.

44. Plaintiff later discovered that Colleen Duke ("Duke"), a white female who worked in a lower classification, received an annual salary $15,000 greater than Plaintiff.

45. Plaintiff later discovered that DiLolio, a white male who worked in a lower classification, received an annual salary $75,000 greater than Plaintiff.

46. On or around September 2020, Plaintiff brought concerns about his salary to Division President Kathleen Kerr ("Kerr"), a white female, and was ignored.

47. Upon information and belief, despite multiple complaints to Human Capital, none of Plaintiff's initial complaints and concerns were ever addressed by the Defendant.

48. Defendant and its agents increasingly retaliated against Plaintiff for his involvement in the Company's internal investigations into discriminatory practices.

49. On or about April, 2019, Plaintiff was interviewed as part of an investigation initiated by complaints made by former employee Clyde Stith ("Stith"), an African-American male.

50. When contacted by internal investigators, Plaintiff was assured the investigative process was confidential.

51. However, at some point, Rosenak became aware of Plaintiff's involvement with the investigation.

52. Following receipt of the information from the Stith Investigation, Rosenak took increasingly adverse action against Plaintiff, including taking multiple successful accounts from Plaintiff's portfolio.

53. In 2019, concurrent with the Stith Investigation, Defendant took two successful projects from Plaintiff (Lifeline and California foster care) and reassigned them to other (non-black) employees.

54. Plaintiff attempted to address the reassignment with the Chief of Human Capital Management and neither Michelle Link ("Link"), white female, or Kevin Black, white male, would meet with Plaintiff.

55. On one occasion, and in relation to Plaintiff's alleged involvement in the Stith investigation, Rosenak expressed "hurt feelings" that Plaintiff was involved with the investigation because she considered Plaintiff "hers."

56. Defendant's failure to maintain the confidential nature of its internal investigations Leadership's divulging of confidential information about ethics investigations has resulted in false allegations about Plaintiff's role in the investigations.

57. In December 2020, in a conversation with Plaintiff, Kerr admitted to previously sharing Plaintiff's confidential information from the Stith investigation with Rosenak.

58. During the same conversation, Kerr informed Plaintiff that both he and Stith were eventually being moved from Rosenak's supervision due to division reorganization.

59. Defendant regularly retaliated against Plaintiff, creating a hostile work environment and causing direct and material harm to Plaintiff.

60. Similarly situated non-black employees, most of whom have less experience than Plaintiff, were offered Covid-19 and Unemployment Insurance-related programs, leads, and positions.

61. For example, Curtis Briggs, a white male with less experience, was promoted to "Unemployment Insurance Director," and Kerr's and Rosenak's children were promoted to key Unemployment and Covid-related roles despite possessing considerably less experience as Plaintiff and despite their lack of accomplishments with the Company as compared to Plaintiff.

62. On one occasion, Plaintiff was involved with attempting to secure a new Unemployment-related account and Rosenak intervened and quoted the potential customer an unusually high price for Defendant's services, thus resulting in Plaintiff's failure to secure the account.

63. On June 14, 2020, Plaintiff discovered that he had been excluded from meetings regarding services related to Covid-19 and Unemployment projects and that Rosenak and others purposefully excluded Plaintiff from opportunities related to potential new accounts.

64. On July 14, 2020, Plaintiff emailed Defendant's "Ethics Hotline" regarding ongoing issues related to Defendant's discriminatory behavior.

65. Despite Plaintiff contacting the Company's Ethics Hotline, Defendants' discriminatory, harassing, and retaliatory behavior continued.

66. In contradiction of Plaintiff's previous decision to defer certain project costs, and in violation of standard operating procedure, Rosenak intervened and authorized certain "direct costs" on the "Illinois Mobile Act" project, resulting in Plaintiff's failure to meet his annual financial goal for 2020.

67. In October, 2020, Rosenak repeatedly sent a series of unnecessary and increasingly hostile emails to Plaintiff.

68. In early 2021, Plaintiff applied for open vice president positions in the Human Services Workforce & Child Support division.

69. In February 2021, Rosenak, contrary to Company policy, made a statement to her

subordinates claiming that someone on her team had applied for a new position in the Company without her knowledge and should know that the interviewer will come to Rosenak for reference.

70. Following this thinly veiled threat, Plaintiff did not receive interviews for various positions for which he applied and, in some cases, withdrew his name from consideration upon learning that Rosenak would discover his attempt to transfer and likely thwart Plaintiff's attempt to do so.

71. On March 12, 2021, the Defendant changed the key qualifications for four vice president positions, to the detriment of Plaintiff, after the positions had been posted and after Plaintiff had applied for the positions.

72. The four "vice president" positions were filled by employees with less experience and less successful projects and Company portfolios and none of those promoted were black males.

73. Among the reasons provided to Plaintiff for the decision was his involvement in the Stith investigation.

74. On January 1, 2021, Defendant moved Plaintiff from Rosenak's supervision and placed him under Kelly Blashke ("Blashke").

75. On April 12, 2021, Plaintiff was moved from Blashke's supervision and is currently under the supervision of Nancy Kim ("Kim"), a white female who has less experience and was hired into one of the vice president positions for which Plaintiff applied.

76. None of the 2021 lateral moves and reorganization resulted in an increase in pay or benefits for Plaintiff.

77. On April 21, 2021, Plaintiff submitted an additional ethics complaint.

78. As a result of Defendant's actions, Plaintiff has suffered considerable economic loss and continues to be undercompensated in relation to his non-black peers.

79. As a result of Defendant's actions, Plaintff has suffered injury to his mental health and considerable emotional distress that has resulted in the need to seek regular counseling and assistance.

80. On or about, March 2, 2021, Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging Defendant discriminated against him based on his race (black) and gender (male). See Exhibit "A".

81. On May 19, 2021, the EEOC issued its Notice of Right to Sue and Plaintiff timely filed this action. See Exhibit "B".

## COUNT I

### (Title VII – Discrimination Based on Race and Sex)

82. Allegations stated supra are hereby re-alleged as if fully set forth herein.

83. Pursuant to 42 U.S.C. § 2000e-2, it is unlawful for an Employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

84. Since on or about 2017, and escalating thereafter, Defendant has engaged in unlawful practices in violation of the Act by treating him disparately than similarly situated employees who were not black males.

85. Specifically, Defendant failed to properly compensate Plaintiff and provide him the same conditions and privileges of employment offered to employees who were not black males.

86. By depriving Plaintiff of these employment opportunities because of his race and sex, Defendant violated 42 U.S.C. § 2000e-2.

87. Defendant's discriminatory actions have caused Plaintiff to suffer a loss of earnings and benefits, thwart his career advancement, and caused pain, humiliation, and considerable mental anguish.

88. The discrimination against Plaintiff violated Title VII of the Civil Rights Act, 42 U.S.C. 2000e-2.

89. This discrimination caused Plaintiff to suffer actual and compensatory damages.

90. Because Defendant and its agents acted purposefully, with malice, and with reckless disregard for Plaintiff's protected rights, the discrimination was intentional and in willful

disregard for Plaintiff's civil rights, punitive damages are warranted.

WHEREFORE, the Plaintiff, Maurice Franklin, hereby requests that judgment be entered in his favor and against the Defendant Maximus Inc., and to award him the following relief:

(a) Declare that the acts and practices complained of herein are in violation of 42 U.S.C. 2000e-2;

(b) Restrain and permanently enjoin these violations of 42 U.S.C. 2000e-2;

(c) Direct the Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect the Plaintiff's employment conditions and opportunities;

(d) Award Plaintiff lost wages due to discriminatorily denied bonuses, benefits, stock grants and lost promotional opportunities;

(e) Award Plaintiff compensatory damages for his mental anguish and humiliation;

(f) Award Plaintiff punitive damages;

(g) Award Plaintiff his costs incurred in connection with this action, including reasonable attorney's fees (if applicable);

(h) Grant Plaintiff such other and further relief as this Court deems just and proper.

## COUNT II

### (Harassment and Retaliation)

91. Pursuant to the Act, an employee who alleges employment discrimination or who assists in the investigation of alleged employment discrimination is protected from retaliatory action by their employers.

92. Defendant has engaged in unlawful and escalating patterns of retaliatory practices in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) by raking adverse actions against Plaintiff because he opposed nepotistic and discriminatory practices, participated in an internal ethics investigations related to allegations of disparate treatment of a black, male employee, and initiated his own internal complaints regarding Defendant's discriminatory actions.

93. The effect of the events described above has been to deprive Plaintiff of equal employment opportunities in retaliation for exercising his federally protected rights.

94. The unlawful employment practices described above were intentional.

95. The unlawful employment practices described above were done with malice or with reckless indifference to Plaintiff's federally protected rights.

96. Further, Defendant's failure to address and correct its agents' intentional and harassing behavior has caused Plaintiff to be subjected to escalating patterns of harassment and disparate treatment resulting in a hostile work environment.

97. By retaliating against Plaintiff because he engaged in protected activity, Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3.

98. This retaliation caused Plaintiff to suffer actual and compensatory damages.

Because the retaliation was intentional and in willful disregard for Plaintiff's civil rights, punitive damages are warranted.

WHEREFORE, the Plaintiff, Maurice Franklin, hereby requests that judgment be entered in his favor and against the Defendant Maximus Inc., and to award him the following relief:

(a) Declare that the acts and practices complained of herein are in violation of 42 U.S.C. § 2000e-3;

(b) Restrain and permanently enjoin these violations of 42 U.S.C. 2000e-3;

(c) Direct the Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect the Plaintiff's employment conditions and opportunities;

(d) Award Plaintiff lost wages, including bonuses, stock grants and benefits and other affirmative and equitable relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to, stock grants, bonus compensation, and compensation related to Defendant's failure to promote Plaintiff;

(e) Award Plaintiff compensatory damages for his mental anguish and humiliation;

(f) Award Plaintiff punitive damages for Defendant's malicious and/or reckless conduct described above, in amounts to be determined at trial;;

(g) Award Plaintiff his costs incurred in connection with this action, including reasonable attorneys fees (if applicable).

(h) Grant Plaintiff such other and further relief as this Court deems just and proper to make Plaintiff whole.

## COUNT III

### (Equal Pay Act)

99. Allegations stated *supra* are hereby re-alleged as if fully set forth herein.

100.     Defendant is an employer within the meaning of the Equal Pay Act, as amended.

101.     Pursuant to the Equal Pay Act, 29 U.S.C. § 206(d), Defendant is required to pay Plaintiff the rate of pay equal to the rate of pay given to employees of the opposite sex for equal work, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

102.     Defendant violated the Equal Pay Act by failing to pay Plaintiff equal to his female coworkers performing the same job.

103.     As a direct result of the violation, Plaintiff has suffered actual damages.

WHEREFORE, the Plaintiff, Maurice Franklin, hereby requests that judgment be entered in his favor and against the Defendant Maximus, Inc., and to award him the following relief:

(a) Declare that the acts and practices complained of herein are in violation of 29 U.S.C. § 206(d);

(b) Restrain and permanently enjoin these violations of 29 U.S.C. § 206(d);

(c) Direct the Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect the Plaintiff's employment conditions and opportunities;

(d) Award Plaintiff lost wages;

(e) Reinstate the Plaintiff or if reinstatement is not feasible, to award the Plaintiff front pay;

(f) Award Plaintiff liquidated damages;

(h) Award Plaintiff his costs incurred in connection with this action, including reasonable attorney's fees if applicable;

(i) Grant Plaintiff such other and further relief as this Court deems just and proper to make the Plaintiff whole.

### Count IV
### (Race Discrimination )
### The Civil Rights Act of 1866, 42 U.S.C. § 1981

104.     Allegations stated *supra* are hereby re-alleged as if fully set forth herein.

105.     Plaintiff, as an African-American, is a member of a protected class based on race.

106.     Plaintiff performed his job satisfactorily at all times employed by Defendant.

107.     Defendant failed to properly compensate, failed to promote and disparately treated Plaintiff because of his race and because of his involvement in an investigation into Defendant's alleged racial discrimination.

108.     By the conduct described above, Defendant deprived Plaintiff, an African-American, of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges of their contractual employment relationship with Defendant, in violation of 42 U.S.C. § 1981.

109.     As a result of Defendant's conduct, Plaintiff has suffered damages including economic losses and emotional distress, in an amount to be determined at trial.

110.     Defendant's actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

WHEREFORE, the Plaintiff, Maurice Franklin, requests the judgment of this Court against Defendant, as follows:

(a). Award the Plaintiff compensatory damages, including pecuniary and non-pecuniary damages in an amount to be determined at the trial of this matter;

(b) Award the Plaintiff his attorney fees (if applicable), including litigation expenses and the costs of this action;

(c) Award the Plaintiff punitive damages in an amount to be determined at the trial in this matter;

(d) Grant such other relief as may be just and proper.

### **Jury Demand**

WHEREFORE, Plaintiff respectfully requests a trial by jury on all issues hereinabove, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date: August 16, 2021                              Respectfully Submitted,


                                                   By: *MAURICE FRANKLIN*
                                                        Maurice Franklin – Pro Se
                                                        [Enter Contact Info]

# EXHIBIT A

# EEOC (INQUIRY) NUMBER: 440-2021-02671

## Inquiry Information

### REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 08/01/2020

**Reason for Complaint:** Retaliation - I filed a charge of job discrimination about any of the above, Retaliation - I complained to my employer about job discrimination

**Pay Disparity:**

**Location of Incident:** California

**Submission (initial inquiry) Date:** 03/02/2021

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:** N/A

**Charge Number:** N/A

**Claim previously filed as complaint with another Agency?** No

**Agency Name:** N/A

**Approximate Date of Filing:** N/A

**Nature of Complaint:** N/A

### INQUIRY OFFICE

**Receiving:** Chicago District Office

**Accountable:** Chicago District Office

### APPOINTMENT

**Appointment Date and time:** 05/12/2021 08:30 AM US/Central

**Interview Type:** Phone

### APPROXIMATE DEADLINE FOR FILING A CHARGE:  06/01/2021

### POTENTIAL CHARGING PARTY

**First Name, Middle Initial:** Maurice

**Last Name:** Franklin

**Street or Mailing Address:** 200 east Illinois street

**Address Line 2:** 1607

**City, State, Zip:** CHICAGO, IL, 60611

**Country:** UNITED STATES OF AMERICA

**Year of Birth:**

**Email Address:** franklinreese@icloud.com

**Home Phone Number:**

**Cell Phone Number:** (773) 749-8238

### RESPONDENT/Employer

**Organization Name:** MAXIMUS

**Type of Employer:** Business or non-profit organization that I applied to, work for, or worked for

**Number of Employees:** 20 or more employees

**Street or Mailing Address:** 1891 Metro Center Dr

**Address Line 2:**

**City, State, Zip Code:** RESTON,VA, 20190

**County:** Fairfax

**Phone Number:** (703) 251-8500

### RESPONDENT CONTACT

**First and Last Name:** Julie Wheat

**Email Address:** Juliewheat@maximus.com

**Phone Number:**

**Title:** Human Resources Director or Owner

### LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

**Street or Mailing Address:** 819 s wabash

**Address Line 2:** Suit 700

**City, State, Zip Code:** CHICAGO, IL, 60605

**County:** Cook

### POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** M

**Disabled:** I do not have a disability

**Are you Hispanic or Latino?** not hispanic or latino

**Ethnicity:** Black or African American,

**National Origin:** Other African

### Adverse Action(s)

I?ve worked for this company for 15 years. Because I refused to allow, the manager?s daughter to report to me, managing my manager?s daughter-in-law did not work out. Because I would no participate in an investigation involving my manager and a colleague, I have been retaliated against Each day for over a year.5. I need help. I can?t afford to lose my job. I feel I?ve been placed into a situation that has been unfair and unacceptable. I?ve asked Chief HR and other leaders for support. It seems they are complicit in the behavior, likely because this manager is part of a team securing millions of contractual unemployment work. The retaliation occurred while I lived in both California and Illinois.

## Supplemental Information

### What Reason(s) were you given for the action taken against you?

APRIL 2021


ETHICS COMPLAINT

Filed by Maurice Franklin, Vice President, Human Services


SUMMARY

I am submitting this complaint on the grounds of discriminatory harassment based on race and gender, on being subjected to a hostile work environment, and on the grounds of violations of company policy regarding fair hiring/promotion and confidentiality.

?      The hiring process for four new Lead VP positions in Human Services violated the company?s policies regarding fair and equal treatment.

?      I have been subject to discrimination against me due to race and gender.

?      I have been subjected to a hostile work environment as a result of my manager?s retaliatory actions

I continue to work in an environment that is prejudiced against me, despite now reporting to a different manager.


VIOLATIONS OF MAXIMUS FAIR HIRING POLICIES

The hiring process for four new Lead VP positions in Human Services violated the company?s policies regarding fair and equal treatment.

?      The hiring process was flawed and biased, with the rules changing as the process unfolded.

?      Applicants were denied the option to apply for two of the four open positions, showing that those positions were pre-filled with appointees without a fair hiring process.

?      The other two open positions were described in sales proposals as being held by the persons who ultimately were chosen, yet before interviews were conducted, again showing that the positions were filled without a fair hiring process.

?      I have more experience and project success than most or all of the candidates ultimately chosen to fill the four Lead VP positions.


BACKGROUND

The Human Services Workforce & Child Support group is going through a reorganization. As child support was consolidated within the group, staff were informed of an additional phase that would create four Lead Vice President positions who would report to the Senior Vice President, Kelley Blaschke Treharne.

Kathleen Kerr assigned Kelly Boerner to help Kelley Treharne with the transition. Kelly Boerner was immersed in the new organization?s design and configuration, including optics around the Lead Vice President positions.

As things progressed, Kelly Boerner and Kelley Treharne presented the new executive leadership structure to the workforce leadership team.  Once the roles were announced, Kelly Boerner attempted to distance herself from the new leadership roles; however, she was a go-to person with follow-up questions about the positions. This showed that she had more involvement in the four positions for which we would ostensibly have an equal opportunity to interview for open positions.  For example, I inquired about the positions being direct or indirect jobs, and Kelly Boerner?s response is attached.

In the end, Kelly Boerner, Lisa Simmons, Nancy Kim, and Rachel Zietlow were selected as Lead Vice Presidents.


KEY POINTS

? Kelly Boerner was very involved in creating the four new Lead VP roles and was appointed to the one that matched her transition duties assigned by leadership during the initial reorganization phase.

? Rachel Zietlow received one of the Lead VP positions.  Before the interviews occurred, in February 2021, Rachel was named by Kelly Boerner in sales proposals with a role nearly identical to the Lead Vice President position that she ultimately received. This creates the assumption that the decision to appoint Rachel to one of the roles was already made before interviews were conducted. Kelly Boehner involved Rachel in the bid process and authorized her description in the bid.  It is beyond coincidence that Rachel would ultimately be selected for the Lead VP position.

? During the position announcement, Kelley Treharne instructed that each interested candidate could apply for only one job, the one that that he/she felt the strongest about.  This is not, to my knowledge, a restriction according to company policy. During the interviews, Kelley recanted those instructions.  The initial questions asked were for the candidate to explain why they selected their position of interest and if they would be interested in interviewing for one of the other openings.  I indicated that I would be interested in other openings.  I never specified which position I would be interested in; that decision was made by Human Capital Management and Kelley Treharne.  This limited my ability to determine which other positions I would like to apply for. The promised second interviews never took place. Instead, we were asked to submit answers to two questions. Applying for the Lead VP of Operations position, Kelly Boerner?s ultimate role, was not an option for anyone at any time.

? Of all the remaining applicants, three women were selected. This gender is the regular group for promotion and growth opportunities. For example, this is the third role Kelly Boerner has received automatically despite her inability to run operations successfully, her lack of people management skills, and her lack of relevant experience in either workforce or child support. Notably, her new position is a direct position, which therefore protects her from future RIFs.

?       Violation of equal opportunity: Passing me up on promotional opportunities and giving it to less qualified individuals. Kelly Boerner was promoted to a child support leadership role despite my having far more experience. This ties into Laura admitting to treating me differently (late 2020).

?     The Clyde Stith investigation was mentioned as the reason why I could not receive an appointment to an LVP position like others did.

I believe that the process of selecting the four Lead VPs was tainted and riddled with shallow attempts to give the illusion of equality, diversity, and inclusion, and went against Maximus policies of fair and equal treatment in hiring and promotions.

DISCRIMINATORY RACIAL HARASSMENT

?     I have been subject to discrimination against me due to race and gender.

o     Leadership in Human Services has routinely and consistently engaged in race and gender discrimination against me and other African American men.

BACKGROUND

Male employees, African American in particular, are constantly held back in Human Services while women are given promotions. Of note: Clyde Stith, Carter Gaskin, Willie Smith, Maurice Franklin, Chuck Roberts.

Each time I had an opportunity for a promotion, there was an unjustified reason to not promote me, despite my excellent resume and proven capabilities. My exposure to growth is limited by the leadership?s practice of holding back Black men in Human Services.

KEY POINTS

?     People of color are treated entirely differently under a different set of rules. If, as in my case for example, they do not go along with the different rules, then they are isolated and held back for no justifiable reason, while others are placed into positions and given development and opportunities without equal process (for example, Curtis Briggs admitted to Lisa Simmons that black people were not given equal opportunities. Of note: Gaye Kelly and son; Melissa Royal, Hayley Secondo, Kelly Boerner, Colleen Martin).

?     In February 2021, Curtis Briggs admitted to Lisa Simmons that he encourages Laura to promote/hire people of color, but she refuses to. Lisa mentioned this to me in March 2021.

? Laura and Kathy have done everything to remove me from the platform that I worked hard for and are now elevating white people. Kathy?s actions and unwillingness to address the issue have triggered the way black people feel at Maximus.

? Laura told me that if I grew my hair out in braids, I could not work for her (Fall 2020, New Orleans meeting).

? During a recent investigation of Laura, she expressed that she did not treat me equally to other Vice Presidents within the company.

? Salary cover up (CA Lifeline): Laura hired staff, placed them under me to manage, had them be client facing and run the program, and pay them more I was making. To hide this salary discrepancy and to keep me in the dark, Laura and Kim Colbe?ck had the staff repo

**Was anyone in a similar situation treated the same, better, or worse than you?**

Yes direct staff and anyone who would not support her allegations.  That attached background document goes further into details about the expectation of people of color and the treatment if they do not comply, untimately resulting in reduction in duties and beign let go.  Clyde's situation is one of the most recent examples and the handling of me after i asked the company for support with the issues.

**Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.**

Clyde Stite - +1 (901) 303-5595

Colleen Duke - +1 (916) 582-2732

Colton - +1 (248) 890-0608

*Mathias - +1 (240) 876-8343

Carter Gasten - +1 (304) 268-2455

*Trisha Thomas - +1 (307) 772-1614

Twamecia Stinson - 678 6654662

**Tracy Bell - +1 (615) 971-2941

Iysha Jackson - 573 230-0467

Michele Bradford - 313 4965169

*Tara Colton - 248-890-0608

**Please tell us any other information about your experience?**

FROM:  Maurice Franklin, Human Services Vice President

SUBJ: ?Request for Ethics Investigation

DATE:

I respectfully request an Ethics investigation into Laura Rosenak, my immediate supervisor, and the Human Services Human Capital organization, led by Kim Colbert.

Ms. Rosenak has subjected me to harassing and subversive actions in retaliation for asserting my right to use the internal Human Capital (HC) processes.  Her harassment, subterfuge, arbitrary acts, interference and lack of fairness, coupled with support from HC who serves to ?catch and kill? complaints against her has led to the decision to seek the Ethics Investigation process as a last hope and resort.

In 2017, I sought HC?s assistance after being directed by Ms. Rosenak to engage in nepotism.  In response to numerous complaints and an investigation, Ms. Rosenak was forced to distance herself from her daughter, Haley Secondo, and common-law daughter-in-law, Melissa Royal.  For years, I witnessed, firsthand, the preferential treatment that Ms. Rosenak gave to both ? especially with respect to their assignments and compensation, which was substantially higher than other employees with much higher credentials.  In an attempt to cure the decision of the investigation and put a layer of management between herself and her daughters, Ms. Rosenak directed me to hire and compensate both daughters on separate occasions.  Having seen the dynamics and the impact on the manager and the team when her daughters were installed in a project, and after she received the decision to separate herself from them, I sought Human Capital?s assistance to find a different solution that would not create an untenable situation.

Prior to my seeking HC?s assistance, Ms. Rosenak and I had a collegial relationship.  I respected her leadership, and she promoted me based on merit -- I have consistently exceeded expectations and client satisfaction throughout my MAXIMUS career.  Since seeking HC?s assistance, Ms. Rosenak has made my professional life

hell.  The switch in her behavior towards me was instant and severe.  The following are specific examples, although the list is not exhaustive.

Physical Harassment

Within weeks of an investigation against Ms. Rosenak (she alluded to the investigation), a small team of us attended oral arguments in Kentucky.  After practicing our presentation one afternoon, Ms. Rosenak dismissed the rest of the team and asked me to stay behind.  She began crying and talked about how she would ?never do anything to me.?  She INSISTED that I hug her, which was EXTREMELY uncomfortable for me and felt like a set-up.  Fortunately, a colleague, Trisha Thomas, walked in, which gave me the opportunity to excuse myself.  This was not the first time that I felt uncomfortable with Ms. Rosenak, as she previously suggested that we get drunk and go dancing.  Since, I have DODGED any opportunity for the two of us to be in an area by ourselves.  The EXTREMELY UNCOMFORTABLE request for physical consolation occurred after I sought HC?s help to avoid participating in her acts of nepotism felt like a set-up.

Arbitrary Acts

On several occasions, since 2017, Ms. Rosenak has assigned or reassigned staff that report to me without my input or knowledge.  It seems as though she is attempting to make this a regular practice to justify the attempted assignment of her daughter and daughter-in-law.  One such example is Michael Lant, who she assigned to and from me without my knowledge. Such acts are clearly bad management, but she seems to do that more frequently to the team members in my portfolio.

In addition, Ms. Rosenak has made a practice of singling out and harassing several staff who report to me. On numerous occasions, she calls out a specific set of team members, and berates them and their work publicly.  Ms. Rosenak has become more emboldened about reaching in and controlling my staff since I sought HC?s help to avoid participating in her acts of nepotism.

Subterfuge

At the Kentucky oral argument event noted above, Ms. Rosenak attempted to drive a rift between a peer and me. I observed a heated conversation between Ms. Rosenak and my peers during lunch one day. Ms. Rosenak abruptly left as I approached their table. It was apparent that she was angry, but the team composed ourselves so that we could focus on the oral argument. After our presentation, I was told by Ms. Rosenak that I needed to ?clear the air? with a peer. I asked for clarity, and was told that ?Kelly is mad at me.? I later learned that Ms. Rosenak told Kelly during that heated lunch conversation that I was attempting to recruit one of her staff, Alexandria Martin. This is entirely untrue, and Ms. Rosenak has never explained to me why she would tell my colleague such a lie. Ms. Rosenak has frequently told lies in an attempt to pit staff against one another. However, Ms. Rosenak started involving me in those lies after I sought HC?s help to avoid participating in her acts of nepotism.

Ms. Rosenak has attempted to make me look incompetent and unprepared on many occasions. She arbitrarily assigns me to lead roles in meetings at the VERY last minute, that involve clients of my peers, although she has substantial notice; and, she intentionally leaves me out of meetings under my span of control! Leaving me out of the loop of my projects creates a gap of critical information. And, thrusting me into situations involving my peers and their clients causes frustration and confusion with my peers. This is another example of poor management. However, I have become the object of this behavior since I sought HC?s help to avoid participating in her acts of nepotism.

Interference

Ms. Rosenak has interfered with my opportunities to respond to job announcements in other areas of the company. In an attempt to leave her control, I have applied to other positions in MAXIMUS. Ms. Rosenak has commented about several of my applications, although I have not shared my search with her. It feels as though she is reminding me that she can get information about my pursuits and has say over my career, whether I include her or not. It is VERY unnerving for her to make comments about positions to which I privately apply. In hindsight, Ms. Rosenak has always commented on my effort to advance outside of her control, but it has become especially negative since I sought HC?s help to avoid participating in her acts of nepotism.

Unfair Compensation

Since 2017, Ms. Rosenak has failed to acknowledge the success of my team. Previously, she raved about my teams, and used it as the primary site for recruiting new staff. When others win contract awards, she sends communications throughout the company announcing the award.  When I receive new or renewed business, she never acknowledges it with a corporate communication.  Further, Ms. Rosenak SEVERELY cut year-end bonuses for the staff in my portfolio since 2017 while raising bonuses for my peers and their portfolios, although my portfolio is the ONLY portfolio within the span of her control that continued to grow in revenue and control costs, while having the lowest paid employees.  The drastic cut in the my bonuses and that of my staff occurred after I sought HC?s help to avoid participating in her acts of nepotism.

?Catch and Kill?

Ms. Rosenak has gained the support of the Human Services HC team, led by Kim Colbeck, so the Ethics process is my LAST hope and resort.  I am aware of numerous HC and Ethics complaints about Ms. Rosenak by staff, including my peers, past and present, and other staff.  I am also aware that many of those complaints have NOT been recorded or investigated.  Rather, HC?s strategy, under Kim Colbeck, has been to squash the complaint and make the complainant disappear.

The company need only look to the attrition of some EXTREMELY talented staff from Ms. Rosenak?s portfolio, check Ms. Rosenak?s business out

# EXHIBIT B

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

EEOC Form 161 (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Maurice Franklin**
**200 east Illinois street #1607**
**Chicago, IL 60611**

From:  **Chicago District Office**
**230 S. Dearborn**
**Suite 1866**
**Chicago, IL 60604**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2021-02671** | **Alison Fisher,** **Investigator** | **(312) 872-9654** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit.  This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Julianne Bowman/np*                                          5/19/2021

Enclosures(s)

**Julianne Bowman,**
**District Director**

(Date Issued)

cc:

**MAXIMUS**
**c/o Bruce Casewell, CEO**
**1891 Metro Center Dr**
**Reston, VA 20190**

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: **Maurice Franklin**
**200 east Illinois street #1607**
**Chicago, IL 60611**

From: **Chicago District Office**
**230 S. Dearborn**
**Suite 1866**
**Chicago, IL 60604**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2021-02671** | **Alison Fisher,**<br>**Investigator** | **(312) 872-9654** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Julianne Bowman/np*                                     5/19/2021

Enclosures(s)

**Julianne Bowman,**
**District Director**

*(Date Issued)*

cc:

**MAXIMUS**
**c/o Bruce Casewell, CEO**
**1891 Metro Center Dr**
**Reston, VA 20190**

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc: